Filed 3/9/20 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| SUMMER J., a minor, etc.,<br><br>    Plaintiff and Appellant,<br><br>      v.<br><br>UNITED STATES BASEBALL FEDERATION,<br><br>    Defendant and Respondent. | B282414 and B285029<br><br>(Los Angeles County<br>Super. Ct. No. BC554468)<br><br>**ORDER MODIFYING AND DENYING PETITION FOR REHEARING; NO CHANGE IN APPELLATE JUDGMENT** |

THE COURT:

    The opinion filed on February 18, 2020, certified for publication, is modified as follows:

    On pages 4, 15 and 17, the date "August 17, 2014" should read "August 17, 2013."

    Respondent's Petition for Rehearing filed on March 4, 2020 is denied.

ORDERED that the opinion be corrected in the Official Reports.

This order does not change the appellate judgment.


_____

PERLUSS, P. J.,                  SEGAL, J.,                  FEUER, J.

Filed 2/18/20 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| SUMMER J., a Minor, etc., | B282414 and B285029 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC554468) |
| v. | |
| UNITED STATES BASEBALL FEDERATION, | |
| Defendant and Respondent. | |

APPEALS from a judgment and postjudgment order of the Superior Court of Los Angeles County, Ross M. Klein, Judge. Reversed and remanded with directions.

Steven B. Stevens, Professional Law Corp., Steven B. Stevens; The Law Offices of Thomas M. Dempsey, Thomas M. Dempsey; Selarz Law Corp. and Daniel E. Selarz for Plaintiff and Appellant.

Manning & Kass, Ellrod, Ramirez, Trester, Sevan Gobel and Ladell Hulet Muhlestein for Defendant and Respondent United States Baseball Federation.

———————————

Writing for the New York Court of Appeals to reverse a judgment in favor of a young man injured while riding an attraction at the Coney Island amusement park, then-Chief Judge Benjamin Cardozo applied the common law doctrine *volenti non fit injuria* ("to a willing person, injury is not done") and explained, "One who takes part in such a sport accepts the dangers that inhere in it so far as they are obvious and necessary, just as a fencer accepts the risk of a thrust by his antagonist or a spectator at a ball game the chance of contact with the ball." (*Murphy v. Steeplechase Amusement Co.* (1929) 250 N.Y. 479, 482-483 [166 N.E. 173].)[1]  Chief Judge Cardozo's embrace of a baseball fan's fundamental responsibility to protect himself or herself from injury from a foul ball—often referred to as the "Baseball Rule"[2]—was consistent with the state of the law throughout the country.  The California Supreme Court in *Quinn v. Recreation Park Assn.* (1935) 3 Cal.2d 725, although holding a stadium operator had a limited duty to provide a screened area at the ballpark, nonetheless observed, "'[I]t has been generally held

---

[1]     Chief Judge Cardozo famously went on to advise, "The timorous may stay at home."  (*Murphy v. Steeplechase Amusement Co.*, *supra*, 250 N.Y. at p. 483; see Kaufman, *Cardozo at 100* (2012) 13 J. App.Prac. & Process 183, 187.)

[2]     See, e.g., Grow & Flagel, *The Faulty Law and Economics of the "Baseball Rule"* (2018) 60 Wm. & Mary L.Rev. 59, 63-64 ("[u]nder what has commonly become known as the 'Baseball Rule,' courts for over a century have consistently held that professional baseball teams are not liable for injuries sustained by fans by bats or balls leaving the field of play, so long as the teams have taken minimal precautions to protect their spectators from harm").

that one of the natural risks assumed by spectators attending professional games is that of being struck by batted or thrown balls; that the management is not required, nor does it undertake to insure patrons against injury from such source.'" (*Id.* at p. 729.) More than 60 years later, the court of appeal in *Lowe v. California League of Prof. Baseball* (1997) 56 Cal.App.4th 112, 123 noted, "[F]oul balls hit into the spectators' area clearly create a risk of injury. If such foul balls were to be eliminated, it would be impossible to play the game. Thus, foul balls represent an inherent risk to spectators attending baseball games. . . . [S]uch risk is assumed."[3] (See generally *Neinstein v. Los Angeles Dodgers, Inc.* (1986) 185 Cal.App.3d 176, 181 ["it is not the role of the courts to effect a wholesale remodeling of a revered American institution through application of the tort law"].)

In sharp contrast to this judicial view of fans' accountability for their own protection from balls hit into the stands, at Major League Baseball's 2019 winter meetings Commissioner Rob Manfred announced that all 30 major league teams will expand the protective netting in their stadiums "substantially beyond the end of the dugout" for the 2020 season and that seven or eight stadiums will run netting all the way to the foul poles. (Young & Cosgrove, *Baseball commissioner says all 30 MLB teams will expand protective netting for 2020 season*

---

[3] The issue in *Lowe* was whether the distraction caused by a minor league team's mascot increased the inherent risk of a spectator being hit by a foul ball. Reversing the trial court's order granting summary judgment in favor of defendants, the court of appeal held that was "an issue of fact to be resolved at trial." (*Lowe v. California League of Prof. Baseball*, *supra*, 56 Cal.App.4th at p. 123.)

3

(Dec. 11, 2019) <https://www.cnbc.com/2019/12/11/baseball-commissioner-says-all-30-mlb-teams-to-expand-protective-netting.html> [as of Feb. 18, 2020], archived at <perma.cc/66dg-72DB>.)  Extended netting is also being installed in many minor league ballparks.  (Reichard, *All MLB Ballparks Will Feature Extended Netting in 2020*, Ballpark Digest (Dec. 11, 2019) <https://ballparkdigest.com/2019/12/11/all-mlb-ballparks-will-feature-extended-netting-in-2020/> [as of Feb. 18, 2020], archived at <perma.cc/MJQ7-9HPT>.)

To what extent should this modern, practical view of the importance of protective netting shape the legal system's understanding of the risks inherent in attending a baseball game and the responsibility of stadium owners to minimize spectator injuries from foul balls?  Phrased more specifically in terms of California tort law and the doctrine of primary assumption of risk, would the provision of adequate protective netting in a perceived zone of danger behind home plate (or for field-level seating along the first- and third-base lines between home plate and the dugouts) increase safety and minimize the risk of injury to spectators without altering the nature of baseball as it is played today in professional and college ballparks?  We conclude it would and, accordingly, reverse the judgment entered in favor of the United States Baseball Federation (US Baseball) after the trial court sustained without leave to amend US Baseball's demurrer to the first amended complaint of 12-year-old Summer J., who was seriously injured by a line drive foul ball while watching a baseball game sponsored by US Baseball.

## FACTUAL AND PROCEDURAL BACKGROUND

Summer attended US Baseball's national team trials on August 17, 2014 at Blair Field, located on the campus of

California State University, Long Beach (CSULB), a stadium jointly owned and maintained by the City of Long Beach and CSULB.  Summer was seated in the grandstand or "spectator bleachers," an area of the stadium without a protective screen or netting.  When she was "momentarily distracted from the field of play," Summer was struck in the face by a line drive foul ball, which caused serious injury, including damage to her optic nerve.

Through her guardian ad litem, Lee J., Summer sued the City of Long Beach, CSULB and US Baseball, asserting in her original and first amended complaints causes of action for negligence and premises liability.[4]  As to US Baseball, Summer alleged it sponsored the game at which she was injured and controlled the stadium on that day.  She further alleged inadequate protective netting was provided for spectators at Blair Field "in the perceived zone of danger behind home plate." The presence of some limited netting at the stadium gave Summer a false sense of security that watching the game in a seat beyond this protected area would be safe.  Summer further alleged US Baseball and the other defendants were aware of the inadequate nature of the netting, yet failed to provide any warnings regarding the danger of being struck by a batted ball.

US Baseball demurred to the first amended complaint, contending the lawsuit was barred under the primary assumption of risk doctrine.  US Baseball also argued the alleged dangerous condition at the stadium was open and obvious, relieving it of any duty to warn or correct the condition it might otherwise have.

---

[4]     The City of Long Beach and CSULB are not parties to this appeal.

5

While the demurrer was pending, Summer moved for leave to file a second amended complaint.[5]  She argued she could provide further factual allegations regarding dangers at Blair Field from hard-hit foul balls that were not inherent risks in the sport of baseball, including the failure to install protective netting for field-level seating along the first- and third-base lines between the batter's box and the dugouts and the configuration of seating that brought spectators in the front rows closer to the field of play than 70 feet as recommended for college stadiums, as well as the provision of enhanced Wi-Fi to encourage use of mobile devices and brightly colored advertising on the outfield fences that distracted fans from the activity on the field.

After briefing and oral argument the court sustained US Baseball's demurrer without leave to amend, ruling Summer's claims were barred under the primary assumption of risk doctrine and the proposed amendments would not cure the defects in the pleading.

Judgment, including an award of costs in an amount to be determined, was entered in favor of US Baseball on February 28, 2017.  US Baseball filed its memorandum of costs on March 9, 2017, requesting a total of $4,902.24.  Summer moved to tax costs.  The trial court denied the motion on June 30, 2017.  Summer filed timely notices of appeal from the judgment on May 1, 2017 (B282414) and from the postjudgment order denying her motion to tax costs on August 28, 2017 (B285029).

---

[5]     The additional allegations in the initial iteration of the proposed second amended complaint were primarily directed to the City of Long Beach and CSULB.  In a revised version filed shortly after she had filed her opposition to US Baseball's demurrer, Summer focused on US Baseball.

## DISCUSSION

### 1. *Standard of Review*

"In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory." (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162.) "In making this determination, we must accept the facts pleaded as true and give the complaint a reasonable interpretation." (*Mathews v. Becerra* (2019) 8 Cal.5th 756, 762.) "If the demurrer was sustained without leave to amend, we consider whether there is a 'reasonable possibility' that the defect in the complaint could be cured by amendment." (*King v. CompPartners, Inc.* (2018) 5 Cal.5th 1039, 1050.) The burden is on the plaintiff to prove that amendment could cure the defect. (*Ibid.*)

Application of the primary assumption of risk doctrine is also a question of law subject to de novo review. (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003-1004 (*Kahn*); *Hass v. RhodyCo Productions* (2018) 26 Cal.App.5th 11, 23; see *Rosencrans v. Dover Images, Ltd.* (2011) 192 Cal.App.4th 1072, 1083 ["the legal question of duty, and specifically the question of whether a particular risk is an inherent part of a sport, 'is necessarily reached from the common knowledge of judges, and not the opinions of experts'"]; *Staten v. Superior Court* (1996) 45 Cal.App.4th 1628, 1635 ["[t]he determinant of duty, 'inherent risk,' is to be decided solely as a question of law and based on the general characteristics of the sport activity and the parties' relationship to it"]; see generally *Vasilenko v. Grace Family Church* (2017) 3 Cal.5th 1077, 1083 ["[t]he existence of a duty is a question of law, which we review de novo"].) In deciding

7

the issue of inherent risk for purposes of the primary assumption of risk doctrine, judges and justices "may consider not only their own or common experience with the recreational activity involved but may also consult case law, other published materials, and documentary evidence introduced by the parties on a motion for summary judgment." (*Nalwa v. Cedar Fair, L.P.* (2012) 55 Cal.4th 1148, 1158 (*Nalwa*); see *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 775-776, fn. 5 [court may consider published material on legal questions "as an aid to the court's work of interpreting, explaining and forming the law" without formally taking judicial notice of it].)

    2.   Knight v. Jewett *and Its Progeny:  The Principles Governing the Primary Assumption of Risk Doctrine*

In *Knight v. Jewett* (1992) 3 Cal.4th 296 (*Knight*), in a plurality decision written by Chief Justice George and subsequently accepted by other members of the Court except Justice Kennard (see, e.g., *Shin v. Ahn* (2007) 42 Cal.4th 482, 491; *id.* at pp. 500-501 (conc. & dis. opn. of Kennard, J.)), the Supreme Court reformulated California's assumption of risk doctrine and held, applying "primary assumption of risk" in a sports setting, the plaintiff is said to have assumed the particular risks inherent in a sport by choosing to participate and the defendant generally owes no duty to protect the plaintiff from those risks.  "[A] court need not ask what risks a particular plaintiff subjectively knew of and chose to encounter, but instead must evaluate the fundamental nature of the sport and the defendant's role in or relationship to that sport in order to determine whether the defendant owes a duty to protect a

8

plaintiff from the particular risk of harm." (*Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 161 (*Avila*).)[6]

Although individuals generally owe a duty of care not to cause an unreasonable risk of harm to others (Civ. Code, § 1714, subd. (a)), when the primary assumption of risk doctrine applies, "operators, instructors and participants in the activity owe other participants only the duty not to act so as to *increase* the risk of injury over that inherent in the activity." (*Nalwa*, *supra*, 55 Cal.4th at p. 1154.)[7] "The primary assumption of risk doctrine rests on a straightforward policy foundation: the need to avoid chilling vigorous participation in or sponsorship of recreational

---

[6]    "Secondary assumption of risk," in contrast, "arises when the defendant still owes a duty of care, but the plaintiff knowingly encounters the risks attendant on the defendant's breach of duty." (*Avila, supra*, 38 Cal.4th at p. 161, fn. 6; see *Knight, supra*, 3 Cal.4th at p. 308; see also *Gregory v. Cott* (2014) 59 Cal.4th 996, 1001 ["Since its reformulation in *Knight* . . . , California's assumption of risk doctrine has taken two quite different forms. Primary assumption of risk is a complete bar to recovery. It applies when, as a matter of law, the defendant owes no duty to guard against a particular risk of harm. Secondary assumption of risk applies when the defendant does owe a duty, but the plaintiff has knowingly encountered a risk of injury caused by the defendant's breach. Liability in such cases is adjudicated under the rules of comparative negligence"].)

[7]    The *Nalwa* Court held the primary assumption of risk doctrine is not limited to activities classified as sports, but applies to any physical recreational activity that involves an inherent risk of injury, including, in the case then before it, bumper car rides at an amusement park. (*Nalwa, supra*, 55 Cal.4th at pp. 1156-1157.)

9

activities by imposing a tort duty to eliminate or reduce the risks of harm inherent in those activities.  It operates on the premise that imposing such a legal duty 'would work a basic alteration—or cause abandonment' of the activity." (*Id.* at p. 1156.)

As applied to the potential liability of sports participants themselves, careless conduct alone is not enough; a participant owes no duty to protect a coparticipant from particular harms arising from ordinary or simple negligence.  (*Avila, supra,* 38 Cal.4th at p. 161; *Knight, supra,* 3 Cal.4th at pp. 308-309.) Rather, "coparticipants' limited duty of care is to refrain from intentionally injuring one another or engaging in conduct that is 'so reckless as to be totally outside the range of the ordinary activity involved in the sport.'" (*Shin v. Ahn, supra,* 42 Cal.4th at pp. 489-490.)

The Supreme Court, however, has repeatedly emphasized the question of duty in the recreational context depends not only on the nature of the activity but also on the "'role of the defendant whose conduct is at issue in a given case.'" (*Kahn, supra,* 31 Cal.4th at p. 1004, quoting *Knight, supra,* 3 Cal.4th at p. 318.)  "Duties with respect to the same risk may vary according to the *role* played by particular defendants involved in the sport." (*Kahn,* at p. 1004; accord, *Nalwa, supra,* 55 Cal.4th at p. 1161 ["[t]he scope of the duty owed to participants in active recreation . . . depends not only on the nature of the activity but also on the role of the defendant whose conduct is at issue"]; see *Avila, supra,* 38 Cal.4th at p. 162 ["we have also noted in dicta that those responsible for maintaining athletic facilities have a similar duty not to increase the inherent risks, albeit in the context of businesses selling recreational opportunities"].)  Demonstrating this distinction, the Court, first in *Knight* and then again in

10

*Kahn*, explained a batter in baseball has no duty to avoid carelessly throwing a bat after hitting the ball—such conduct being an inherent risk of the sport—but "a stadium owner, because of his or her different relationship to the sport, may have a duty to take reasonable measures to protect spectators from carelessly thrown bats. For the stadium owner, reasonable steps may minimize the risk without altering the nature of the sport." (*Kahn*, at p. 1004; see *Knight*, at p. 317.) Similarly, in *Nalwa*, although the Supreme Court held the operator of a bumper car ride had no duty to eliminate or minimize head-on bumping, a risk inherent in the activity, it also recognized the operator "might violate its 'duty to use due care not to increase the risks to a participant over and above those inherent' in the activity [citation] by failing to provide routine safety measures such as seat belts, functioning bumpers and appropriate speed control . . . ." (*Nalwa*, at p. 1163; see *Hass v. RhodyCo Productions*, *supra*, 26 Cal.App.5th at p. 38 [as both *Knight* and *Nalwa* teach, "[w]hile the operator or organizer of a recreational activity has no duty to decrease risks *inherent* to the sport, it does have a duty to reasonably minimize *extrinsic* risks so as not to unreasonably expose participants to an increased risk of harm"].)

The significance of the defendant's role as the operator or organizer of the activity in defining the scope of its duty to an injured participant or bystander has been illustrated in a number of court of appeal decisions applying the primary assumption of risk doctrine. Thus, the inherent risk in baseball that a pitcher will be hit by a line drive does not preclude a determination that the design and use of a particular type of aluminum bat unreasonably increased the inherent risk of injury to the pitcher (see *Sanchez v. Hillerich & Bradsby Co.* (2002) 104 Cal.App.4th

11

703, 715); the inherent risk in long-distance running of dehydration and hyponatremia does not mean the organizer of a marathon race had no duty to participants to arrange and conduct a reasonably safe event by providing sufficient water and electrolyte replacement drinks, which "'minimize[d] the risks without altering the nature of the sport'" (*Saffro v. Elite Racing, Inc.* (2002) 98 Cal.App.4th 173, 175, 179; see *Hass v. RhodyCo Productions*, *supra*, 26 Cal.App.5th at pp. 38, 40 [inherent risk of cardiac arrest in long-distance running does not preclude finding race organizer had duty to provide emergency medical services]); and the inherent risk of being hit by a misguided golf shot does not prevent a finding the owner of a golf course unreasonably exposed golfers to that risk by its poor design of the course (see *Morgan v. Fuji Country USA, Inc.* (1995) 34 Cal.App.4th 127, 134-135;[8] see also *Rosencrans v. Dover Images, Ltd.*, *supra*, 192 Cal.App.4th at p. 1084 [owner of motocross track has duty to provide a system for signaling when riders have fallen to minimize risk of collisions].)

In *Grotheer v. Escape Adventures, Inc.* (2017) 14 Cal.App.5th 1283 the court held, under the primary

---

[8] The court in *Morgan v. Fuji Country USA, Inc.*, *supra*, 34 Cal.App.4th at page 134 explained, "[I]f the relationship between the parties was one of coparticipants, i.e., if the defendant here were the golfer who hit the errant ball . . . the defendant would have no liability towards Morgan because there is an inherent risk that the defendant would hit an errant ball. Morgan, however, is not suing the other player; he is suing the owner and operator of the golf course.  [¶]  Fuji, as owner and operator of the Castle Creek golf course owes a different duty to Morgan and other golfers."

assumption of risk doctrine, a hot air balloon company had no duty to protect its customers from crash landings caused by its pilot's failure to safely manage the balloon's descent (*id.* at p. 1298), but did have a duty to provide passengers instructions on safe landing procedures (*id.* at p. 1302).  As our colleagues in Division Two of the Fourth District explained, "Safety is important, but so is the freedom to engage in recreation and challenge one's limits.  The primary assumption of risk doctrine balances these competing concerns by absolving operators of activities with inherent risks from an obligation to protect their customers from those risks.  [¶]  What the primary assumption of risk doctrine does not do, however, is absolve operators of *any obligation* to protect the safety of their customers.  [Citation.]  As a general rule, where an operator can take a measure that would increase safety and minimize the risk of the activity *without also altering the nature of the activity*, the operator is required to do so." (*Id.* at pp. 1299-1300; see *id.* at p. 1301 ["the primary assumption of risk doctrine has never relieved an operator of its duty to take reasonable steps to minimize inherent risks without altering the nature of the activity"].)

> 3. *Summer's Proposed Second Amended Complaint States Causes of Action for Negligence and Premises Liability Against US Baseball*

> a. *Summer has adequately alleged duty and breach*

Summer alleged in her first amended complaint and proposed to allege in a second amended complaint that Blair Field had inadequate protective netting in the perceived zone of danger behind home plate (first amended complaint) or for field-level seating along the first- and third-base lines between home plate and the dugouts (proposed second amended complaint).

13

She also proposed to allege the danger to spectators of being hit by hard-hit foul balls in the high-risk, unscreened area at Blair Field had been increased by addition of box seats on the field level along the first- and third-base lines that were closer to the field of play than the distance recommended for college baseball stadiums by the National Collegiate Athletic Association (NCAA) and creation of unnecessary distractions at the ball park including large, colorful advertising on the outfield wall and Wi-Fi ready access to encourage spectators to use their mobile devices during ballgames.

The trial court ruled these allegations were insufficient to state a cause of action for either negligence or premises liability because being hit by a foul ball is an inherent risk to spectators attending baseball games.[9] The court reasoned, "The lack of netting is not an increase of inherent risks. Placing such netting

---

[9]   "The elements of a negligence claim and a premises liability claim are the same:   a legal duty of care, breach of that duty, and proximate cause resulting in injury.  [Citations.] Premises liability "'is grounded in the possession of the premises and the attendant right to control and manage the premises'"; accordingly, "'mere possession with its attendant right to control conditions on the premises is a sufficient basis for the imposition of an affirmative duty to act.'"  [Citation.]  But the duty arising from possession and control of property is adherence to the same standard of care that applies in negligence cases." (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1158; see *Alcaraz v. Vece* (1997) 14 Cal.4th 1149, 1156 ["'[t]he proper test to be applied to the liability of the possessor of land . . . is whether in the management of his property he has acted as a reasonable man in view of the probability of injury to others'"].)

14

might decrease the inherent risks of being hit by a foul ball, but that is not the inquiry."

On appeal US Baseball defends the ruling sustaining the demurrer without leave to amend with a similar argument, insisting in the opening paragraph of its brief, "[T]here is no legal duty to eliminate the inherent risk of being hit by a ball while watching a baseball game or to otherwise protect a spectator from being hit by a ball." US Baseball reiterates this position later in its brief, arguing, "The Supreme Court has determined, as a matter of policy, that in the context of risks inherent in a sporting event, the duty to be imposed on sponsors is limited to a duty not to increase those risks. Primary assumption of risk precludes any other duty relative to the inherent risks of the sport."

These cramped descriptions by the trial court and US Baseball fundamentally misperceive the nature of US Baseball's duty to fans attending the August 17, 2014 national team trials.[10] To be sure, foul balls are part of baseball. But as the entity responsible for operating Blair Field on that date,[11] US Baseball had a duty not only to use due care not to

---

[10]    That a stadium operator has no duty of any sort to protect spectators from foul balls, as argued by US Baseball, has never been the law in California. The Supreme Court in *Quinn v. Recreation Park Assn.*, *supra*, 3 Cal.2d 725, more than 50 years before *Knight*, held stadium management had a duty of ordinary care that was satisfied by providing screened seats for as many spectators as may be reasonably expected to ask for those seats on any ordinary occasion. (*Id.* at p. 729.)

[11]    In her first amended complaint Summer alleged US Baseball, as the sponsor of the baseball game and lessee of Blair Field, was responsible for maintaining spectator safety at

15

increase the risks to spectators inherent in the game but also to take reasonable measures that would increase safety and minimize those risks without altering the nature of the game. (See *Kahn, supra*, 31 Cal.4th at p. 1004 ["[f]or the stadium owner, reasonable steps may minimize the risk without altering the nature of the sport"]; *Knight, supra*, 3 Cal.4th at p. 317 [same]; *Hass v. RhodyCo Productions, supra*, 26 Cal.App.5th at pp. 38, 40; *Grotheer v. Escape Adventures, Inc., supra*, 14 Cal.App.5th at pp. 1299-1301.)

Installing protective netting down the first- and third-base lines at least to the dugouts would certainly increase safety and minimize risk to fans sitting in those areas. Would it alter the nature of the game? The court in *Lowe v. California League of Prof. Baseball, supra*, 56 Cal.App.4th 112, using language quoted by the trial court in its ruling, surmised it would: According to the court, if foul balls hit into the stands were eliminated, "it would be impossible to play the game." (*Id.* at p. 123.) Other courts in past generations have agreed. (See, e.g., *Neinstein v. Los Angeles Dodgers, Inc., supra*, 185 Cal.App.3d at p. 181

---

the stadium on the day she was injured. In her proposed second amended complaint Summer alleges US Baseball not only sponsored and organized the game at which she was injured but also controlled Blair Field on the day of the game. Whether she can provide evidence to support those allegations is not now at issue. (See *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 47 ["'[I]t is not the ordinary function of a demurrer to test the truth of the plaintiff's allegations or the accuracy with which [s]he describes the defendant's conduct . . . . '[T]he question of plaintiff's ability to prove these allegations, or the possible difficulty in making such proof does not concern the reviewing court.'"].)

[protective screens would interfere with the players' ability to reach into the spectator area to catch foul balls, "changing the very nature of the game itself"].)  As discussed, however, Commissioner Rob Manfred, the 30 major league baseball teams and many minor league teams disagree, all of them planning to expand protective netting in their stadiums substantially beyond the end of the dugouts for the upcoming 2020 season.  (See generally Grow & Flagel, *The Faulty Law and Economics of the "Baseball Rule"* (2018) 60 Wm. & Mary L.Rev. 59, 85-98 [discussing developments during the past 25 years that have increased the risk of being injured by foul balls at professional baseball games, including changes in stadium construction that bring spectators closer to the playing field, elevated velocity of pitched balls and increased distractions such as free Wi-Fi].)  Allegations incorporating the views of experienced baseball professionals that extending protective netting along the first- and third-base lines will minimize the inherent risk of being injured by a foul ball without fundamentally changing the game adequately identify an enforceable duty, at least for pleading purposes.  (Cf. *Nalwa*, *supra*, 55 Cal.4th at p. 1163.)  Accordingly, Summer should be permitted to file an amended pleading alleging US Baseball had a duty to ensure there was adequate protective netting at Blair Field on August 17, 2014 and acted unreasonably, breaching that duty of care, by failing to provide netting on the field level along the first- and third-base lines at least from home plate to the dugouts.  Whether the evidence will support those allegations, which will require an evaluation of the extent of the stadium's existing netting, the proximity of unprotected seats to the playing field and the history of previous injuries in the seating area at issue, is not now before us.  (See

17

*Mathews v. Becerra, supra*, 8 Cal.5th at p. 762 ["surviving demurrer is no assurance of success on the merits once evidence is developed and considered.  But we see no basis to prejudge what the evidence will show"].)

  b. *Any issue of "open and obvious danger" cannot be resolved on demurrer*

As an alternate basis for holding US Baseball liable for her injuries, Summer alleged US Baseball was aware of the inadequate nature of the netting at Blair Field, yet failed to warn her of the danger of being struck by a foul ball where she was seated.  In its demurrer US Baseball contended that danger was so obvious it had no duty to warn Summer of the risk.  (See, e.g., *Jacobs v. Coldwell Banker Residential Brokerage Co.* (2017) 14 Cal.App.5th 438, 447 ["'Generally, if a danger is so obvious that a person could reasonably be expected to see it, the condition itself serves as a warning, and the landowner is under no further duty to remedy or warn of the condition.'  [Citation.]  In that situation, owners and possessors of land are entitled to assume others will 'perceive the obvious' and take action to avoid the dangerous condition"]; see also *Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 673.)

In response to US Baseball's open-and-obvious defense, Summer argues (and, presumably, can allege in an amended pleading) (1) the presence of some protective netting misled her (as well as other reasonably prudent spectators) into believing the unprotected seats were outside the perceived zone of danger with a high risk of injury from foul balls (in effect, an argument that the nature of the risk of injury had been concealed); and (2) because the protective netting behind home plate was unusually narrow and the spectator seats atypically close to the

18

field of play, the dangers in the unprotected seating at Blair Field "are noticeable only if the spectator has expertise in mathematics, physics, human factors, or stadium design." In light of these proposed allegations, whether the danger of injury from foul balls in unprotected seating was sufficiently obvious to relieve US Baseball of its duty to warn Summer of its existence is, at most, a question of fact that cannot be resolved on demurrer.[12] (See *Chance v. Lawry's, Inc.* (1962) 58 Cal.2d 368, 374 [whether the danger created by an open planter box in a narrow foyer of a busy restaurant was sufficiently obvious to eliminate the owner's duty to warn "was peculiarly a question of fact to be determined by the jury"]; *Henderson v. McGill* (1963) 222 Cal.App.2d 256, 260 ["'[i]t is ordinarily a question of fact whether in particular circumstances the duty of care owed to invitees was complied with, . . . whether the particular danger was obvious'"]; see also *Donohue v. San Francisco Housing Authority* (1993) 16 Cal.App.4th 658, 665 ["[T]he 'obvious danger' exception to a landowner's ordinary duty of care is in reality a recharacterization of the former *assumption of the risk* doctrine, i.e., where the condition is so apparent that the plaintiff must have realized the danger involved, he assumes the risk of injury

---

[12]     As the court of appeal noted in *Morgan v. Fuji Country USA, Inc.*, *supra*, 34 Cal.App.4th at page 135, footnote 3, in response to the open-and-obvious argument of the golf course owner and operator, "Under *Knight*, the obviousness of a risk may, however, support a duty to provide protection, e.g., as in the case of a baseball stadium where the stadium operator may be obligated to provide protection for spectators in an area where the danger and risk of being hit by a thrown bat or errant ball is particularly obvious."

19

even if the defendant was negligent. [Citation.] . . . [T]his type of assumption of the risk has now been merged into comparative negligence"].)[13]

## DISPOSITION

The judgment and postjudgment order denying Summer's motion to tax costs and awarding costs to US Baseball are reversed. The matter is remanded with directions to the trial court to vacate its order sustaining US Baseball's demurrer without leave to amend and to enter a new order sustaining the demurrer and granting Summer leave to file a second amended complaint. Summer is to recover her costs on appeal.

PERLUSS, P. J.

We concur:

SEGAL, J.          FEUER, J.

---

[13]     Our reversal of the judgment in favor of US Baseball necessarily compels reversal of the award of costs to it as the prevailing party pursuant to Code of Civil Procedure section 1032, the subject of Summer's appeal in B285029. (*Ducoing Management, Inc. v. Superior Court* (2015) 234 Cal.App.4th 306, 314; *Allen v. Smith* (2002) 94 Cal.App.4th 1270, 1284.)